Filed 9/8/20

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D074972 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD274255) |
| HASHMATULLAH ZAHEER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Esteban Hernandez, Judge.  Reversed and remanded for further proceedings.

Charles M. Sevilla, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Daniel Rogers and Sharon L. Rhodes, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Hashmatullah Zaheer was tried twice for sexual battery by restraint. He denied any wrongdoing, and the case—like many of its kind—hinged entirely on the credibility of the victim, Martha M.[1] In the first trial, Zaheer was nearly acquitted of the two felonies with which he was charged, with the jury voting 11–1 in his favor on both counts. In the second trial, however, he was convicted of both felonies.

A key aspect of the defense attack on Martha's credibility involved the operational condition of the electronic door lock system in Zaheer's car, an older Honda Civic. In both trials, Martha testified in some detail about how Zaheer locked her inside the car by pressing a button on the driver's side door. Responding to this testimony, the defense presented compelling evidence that the electronic locking mechanism in Zaheer's car had not worked in years. In the second trial, however, defense counsel simply failed to establish the necessary predicate fact that Martha was in Zaheer's *Honda* on the night in question. And despite having knowledge to the contrary, the prosecutor seized on this oversight to suggest for the first time during her closing argument that Zaheer might have been driving a company car. In a case that hinged entirely on whether the jury believed Martha—and with a jury in the first trial that largely did not—we are compelled to conclude that defense counsel's error, as compounded by the prosecutor's comment, was prejudicial. Accordingly, we reverse the judgment and remand the case for further proceedings.

---

[1] To protect personal privacy, we refer to the victim and some witnesses by their first names or initials, intending no disrespect. (Cal. Rules of Court, rule 8.90.)

FACTUAL AND PROCEDURAL BACKGROUND

This case is factually simple but has a complex history. Martha accused Zaheer of sexually assaulting her as they sat in his car parked outside her apartment complex. A first jury hung, leaning heavily in favor of acquittal on the felonies and split on the misdemeanor lesser offenses. On retrial, the second jury convicted Zaheer as charged. Because our analysis necessitates familiarity with both trials, we describe Martha's account and briefly relate what happened in each.

1.      *Martha's Account*

In October 2017, Zaheer and Martha were both students in an English language course at Miramar Community College. Most students in the class were immigrants, and they were encouraged to socialize together to practice their English. Zaheer initiated a conversation with Martha and asked her if they could be friends. He also inquired about her relationship status (she was divorced) and told her he was separated from his wife. She jokingly responded, "Welcome to the singles club," and they exchanged numbers. When they arranged to meet on a Wednesday evening at a Starbucks near Martha's apartment complex, Zaheer insisted on picking her up.

They arrived at the Starbucks around 7:00 p.m., ordered beverages and sat on the outside patio. Zaheer suggested to Martha that since he didn't have a girlfriend and she didn't have a boyfriend, they could get to know each other. He also said he was lonely and looking for someone with whom he could have sex. She responded that she was not looking for that kind of relationship, and she was not the person he was looking for. Seemingly undeterred, Zaheer asked if he could sit next to her. She acquiesced. They looked at pictures together on her phone, and she showed him photos of her family and home country. Then Zaheer asked if he could give her a "friendly

3

hug." She agreed to this, but when his hand crept down her shoulder to touch her breast, she said no. He kissed her on the neck and lips even though she was telling him to stop. She pulled away, visibly upset, and stood up. Zaheer apologized. Martha asserted it was time to go home, and they left.

Zaheer drove her back to her apartment complex and parked nearby at Martha's instruction; she didn't want him to see exactly where she lived. As she prepared to get out of the car, she told him she wanted no further contact. They could not be friends, and she did not want him to talk to her in class. She reached for the door, which she said was unlocked, but Zaheer grabbed her hand and said, "Don't do it." Then he allegedly locked her door from his side of the car; she heard a click, and when she reached for the handle again she now found her door locked. For the next several minutes, she fought Zaheer as he tried to force her into sexual activity. He became increasingly aggressive and angry when she would not comply, and she feared for her life. Leaning over her from the driver's seat, Zaheer alternated between holding Martha's hands at the wrists and forearms, and trying to push her crossed legs apart. When Martha refused to kiss him, Zaheer bit her lip and then exposed one of her breasts, putting his mouth over it.[2] He also unzipped his pants, took out his penis, and forced her to touch it with her hand.

During the struggle, Martha focused on how she could escape. She was able to manually unlock the passenger-side door with her thumb. Then, hoping she could distract Zaheer long enough to get out, she pretended to give in to his advances. While Zaheer was leaning over her, touching and kissing her chest area, she reached for the door handle and kicked the door

---

[2]    Martha did not include this aspect of the assault in her first written statement; she reported it for the first time the Monday after the incident when she spoke with Eric Groeger, a campus police officer.

open. She grabbed her purse and ran out. Zaheer stared at her, and then quickly exited from the driver's side. He intercepted her and, nearly lifting her off the ground, grabbed her buttocks and pressed her body against his. He told her, "This belongs to me, nobody else can touch it but me," releasing her only after she met his demand for a kiss on the lips.

Shaken, Martha went immediately to her friend Sylvia's apartment. Sylvia was not home, but Martha knew she often visited Lupe, another neighbor, and looked for her there. In Lupe's apartment, Martha found Sylvia, Lupe, and Lupe's renter, Lourdes. Because Martha was only friends with Sylvia, she did not want to tell the other women what had just happened. But when she and Sylvia were alone later that night, she disclosed what Zaheer had done.

Martha took pictures of her lip. It was swollen from Zaheer biting it. Not wanting to see him at school the following day, she skipped class and reached out to her professor, Charles Glenn Hoyle, for help. She told him in an e-mail that Zaheer had abused her. Hoyle asked Martha to write a statement about what happened. She did so, initially writing it in Spanish, and it took a few days for her friend to provide an English translation. In the meantime, Martha attempted to make reports at the Poway Sheriff's department and a San Diego city police station in Rancho Peñasquitos but was unsuccessful.[3] On Monday, Hoyle advised Martha to report the incident to campus police. She did so that same day. Zaheer was arrested on Tuesday and charged by the San Diego County District Attorney with two counts of

---

[3] Martha said she was unable to file a report in Rancho Peñasquitos because she was turned away; this point was used by the defense to challenge Martha's credibility through Officer Dewitt's testimony, which we discuss below.

felony sexual battery by restraint (Pen. Code § 243.4, subds. (a) and (d)), for touching Martha's breast (count 1) and for forcing her to touch his penis with her hand (count 2).[4]

2.     *The Two Trials*

Zaheer's first trial before Judge Rogers ended in a mistrial as a result of a hung jury. On retrial before Judge Hernandez, he was convicted on both counts. The overarching theme in both trials was that the case turned on Martha's credibility. As the prosecutor remarked in each of her closing arguments, the jury's decision came down to one question: "Do you believe Martha?" Defense counsel agreed, explaining, "if you don't believe Martha, the case is over."

In both trials, the jury heard from Martha, Professor Hoyle, and campus police officer Groeger. In each, the defense presented testimony to establish the electronic door locks in Zaheer's Honda were broken. The trials also differed in several respects,[5] most consequentially in Zaheer's election to testify in the first proceeding, but not in the second. This change precipitated another difference: Zaheer's attorney failed to offer evidence in the second trial that Zaheer picked Martha up in his own Honda, resulting in ambiguity regarding which car Zaheer drove the night of the incident. Because we rest

---

[4]     All further statutory references are to the Penal Code.

[5]     At the first trial, the court permitted some evidence pertaining to both Martha and Zaheer's immigration statuses that was ruled inadmissible in the second trial. Possibly as a result of this ruling, Zaheer did not testify a second time. Various other witnesses made appearances in one trial but not the other, including some defense witnesses called to impeach Martha. Of relevance for our discussion, Officer Daniel Dewitt appeared in the second trial to challenge Martha's account that she went to a Rancho Peñasquitos police station but was turned away. He said it would be unusual for an officer to turn away a victim trying to report a crime.

our ultimate conclusion on the effect of this omission, we explore the testimony about the car in some detail.

At both trials, significant time was devoted to evidence about the door locks in Zaheer's car. Martha's account of how the locks worked in the car was consistent: when Zaheer drove her back to her apartment, the car door on her side was unlocked *until* she said she didn't want to see him anymore and tried to leave. At that point, Zaheer grabbed her hand and locked her door from his side of the car. She heard the click and when she later managed to escape, she had to manually unlock her door to get out.

The defense sought to undermine Martha's credibility by demonstrating that her account of the event was impossible. Automotive technician David Vidaca tested the Honda's lock system in January 2018, shortly after the incident. He found the electronic locking function was disabled—meaning that each door could be locked manually, but the passenger side door could not be locked electronically from the driver's side as Martha described in her testimony. Zaheer's cousin, Shakila A., previously owned the car and sold it to Zaheer in 2015. She testified that the electronic locks did not work even when she owned it. The defendant's wife also confirmed the electronic locks had been broken since they bought the car.

Consistent with these defense witnesses, Zaheer testified in the first trial that the electronic lock system in his Honda had been broken since he purchased the car from his cousin. He further described picking Martha up after he got off work the night they went to the Starbucks and identified his car—the Honda—as the one he was driving. As to his conduct with Martha, he said they kissed consensually in the coffee shop and also in his car. According to him, Martha did touch his penis, but she initiated the contact. He denied everything else.

7

The prosecutor dealt with the door-lock inconsistency in her closing argument at the first trial by asserting that either Martha was mistaken in thinking the door was locked, to no great consequence for the case,[6] or that Zaheer did lock the door—either manually or electronically. The first jury deadlocked 11–1 in favor of acquittal on both counts of felony sexual battery by restraint. (§ 243.4, subds. (a) and (d).) It also voted on, but could not reach verdicts for, the lesser included offenses of misdemeanor sexual battery. (§ 243.4, subd. (e)(1).) At least some jurors who voted to acquit on the felonies would have convicted on the misdemeanors, but five jurors would have voted to acquit on all possible offenses—the two felony counts and the two lesser included misdemeanors.[7]

After the court declared a mistrial, Zaheer's counsel moved to dismiss the charges. In discussing the motion with counsel, Judge Rogers expressed some surprise with the result, noting that he personally found Martha believable. At the same time, he acknowledged that the jury quite clearly did not:

---

[6]    The issue of the locks was significant for both Martha's overall credibility and as one way to establish the unlawful restraint element of sexual battery by restraint. A conviction for sexual battery by restraint requires some degree of force beyond that required to accomplish the physical assault. (See CALCRIM No. 935; see also *People v. Pahl* (1991) 226 Cal.App.3d 1651, 1661; *People v. Arnold* (1992) 6 Cal.App.4th 18, 29.) Zaheer actually locking Martha in the car was one way to establish this element, although if she was otherwise believed his use of physical force (holding her arms) and other actions he took that made her *feel* trapped could also provide the basis.

[7]    The misdemeanor votes were, of course, a hypothetical exercise. The jury was instructed pursuant to CALCRIM No. 3518 that it could return a verdict on a lesser offense only if all jurors agreed the defendant was not guilty of the greater offense.

"Obviously the jurors disagreed [with me about the victim's credibility]. [Eleven] of the jurors thought that this case should be not guilty. The split, such as it was, on the LIOs makes it real clear to me that the restraint issue was troubling the jurors, at least half of them -- or five of them, seven of them. And, of course, that comes back to the overarching point that [defense counsel] is making about the credibility of the victim."

Judge Rogers denied the motion to dismiss, and the prosecution elected to pursue a retrial.

At the second trial before Judge Hernandez, the conflicting accounts about the locks were again presented to the jury. But Zaheer did not testify, and defense counsel did not otherwise establish the type of car he was driving the night of the incident. Neither side questioned Martha about the car. But in cross-examining Zaheer's wife, the prosecutor elicited testimony that Zaheer drove a company car while he was at work delivering auto parts.

In her closing argument, the prosecutor dismissed the door lock issue as a red herring. As before, she suggested that irrespective of any locks, Martha was physically restrained. Moreover, Zaheer's wife and cousin loved him and may have felt compelled to claim the locks did not work. Unlike the first trial though, the prosecutor went on to suggest that Zaheer might not have been driving the Honda:

"We heard [the automotive technician say] those car door lock[s] . . . weren't working. . . . What we don't know is whether or not that was even the car that the defendant was driving . . . he has a company car. There was no testimony that said, yes, that car is the same car that he

9

picked up Martha in.  Maybe it was, maybe it wasn't."[8]

After closing arguments, defense counsel filed a motion for mistrial based on the prosecution's knowing use of a factually false argument.  The motion cited to the same prosecutor's closing argument during the first trial, which included casual references to Zaheer's car as the actual vehicle used and a police report from the discovery materials stating Martha's description of the car matched Zaheer's Honda.  Counsel further noted that according to Officer Groeger's notes, Martha described the car as a Honda Civic.  The prosecutor opposed the motion, explaining, "I did not argue that the Honda was not the car that the defendant drove.  [¶]  I argued there was no evidence that it was the same car."  The defense attorney insisted this distinction made no difference because the prosecutor had suggested to jurors a false inference that went to the "credibility contest" at the heart of the case.  He reiterated that in the first trial "both sides were operating under the assumption that that was the car . . . [¶] . . . Mr. Zaheer and Martha were in."

---

8    With no evidentiary basis to establish which car Zaheer was driving, defense counsel made the best of a bad situation.  He argued during his closing remarks that the vehicle must have been the Honda or the prosecutor would have presented evidence to show otherwise:  "If you're a prosecutor and you know that a significant problem with your case is the fact that this woman, your victim describes in excruciating detail how she listened and saw the car being locked with the electronic locking system, and after she first gives that testimony, the defense later goes out and proves that the locking system doesn't work on that car, on his car.  Now, if you have any question about whether or not that's his car, if there is any doubt in your mind, what are you going to do?  [¶]  You're going to show it to Martha, you're going to say, is this or isn't this his car if there is any doubt at all.  And if that wasn't his car, what do you think would happen?  [¶]  You would have heard Martha on the stand saying that's not the car I was in.  You wouldn't wait until closing argument and try to convince the jury that's a red herring or that's a legitimate reason to explain Martha's testimony and the problems with her testimony."

10

But he conceded that if he had not established this crucial fact in the second trial—and his failure to do so was undisputed—it was "ineffective assistance on my part not to have put that fact before the jury." The motion for mistrial was denied by the trial court.

In a subsequent new trial motion, the defense submitted declarations from Zaheer's wife and supervisor. His wife stated that he always dropped her off at the bus stop on weekday mornings in his Honda, including the morning after the incident, and she had never seen him drive any car other than his own. Zaheer's supervisor said that the company cars were all Toyota Priuses, employees were required to provide their own transit to and from work and return company cars and the keys by 6:00 p.m., and Zaheer never had possession of a company car past 6:00 p.m. during his employment. It was uncontroverted that the encounter with Martha occurred after 7:00 p.m. Counsel stated he would have offered this additional evidence to the jury had he known the prosecutor would suggest Zaheer was driving a different car. The court denied the new trial motion and sentenced Zaheer to two years in state prison.

DISCUSSION

Among other claims, Zaheer asserts his counsel was ineffective for failing to offer foundational evidence that he drove his own car the night of the incident—a mistake exploited by the prosecutor during closing arguments. As we explain, this was a close case that turned on the credibility of the complaining witness, a fact that was apparent to both sides. The inconsistency between Martha's testimony and the malfunctioning door locks on Zaheer's car provided a nontrivial reason to doubt her credibility. On our record, defense counsel's failure to establish which car Martha was in enabled the prosecutor's closing remarks on the issue, and there is a

11

reasonable likelihood that as a result Zaheer was prejudiced.  Since we resolve the appeal in his favor on these grounds, we find it unnecessary to address his additional arguments.

1.    *Ineffective Assistance of Counsel*

The right to effective counsel serves to protect the defendant's constitutional right to a fair and reliable trial.  (*People v. Ledesma* (1987) 43 Cal.3d 171, 215 (*Ledesma*).)  To prevail in a claim of ineffective assistance of counsel, the appellant must first demonstrate that the defense attorney's performance was deficient—meaning it "fell below an objective standard of reasonableness" under "prevailing professional norms"—and then show prejudice resulted.  (*Strickland v. Washington* (1984) 466 U.S. 668, 688 (*Strickland*); accord *Ledesma, supra,* at pp. 215–217.)  Reviewing courts "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case" (*Strickland*, at p. 690), applying a "context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time of that conduct."  (*Wiggins v. Smith* (2003) 539 U.S. 510, 523.)

An ineffective assistance claim is conventionally brought in a petition for habeas corpus rather than on direct appeal.  (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–267 (*Mendoza Tello*).)  There are myriad reasons why counsel may choose a particular course of conduct, and attorneys should be afforded the opportunity to explain if a decision was tactical when a client alleges their assistance fell below professional standards.  Generally, it is "inappropriate for an appellate court to speculate as to the existence or nonexistence of a tactical basis for a defense attorney's course of conduct." (*People v. Wilson* (1992) 3 Cal.4th 926, 936.)  But there are exceptions to this general rule.  When the record on direct appeal clearly illuminates the reasons for the attorney's challenged conduct and the attorney is afforded an

12

opportunity to explain, reviewing courts are " 'in a position to intelligently evaluate whether counsel's acts or omissions were within the range of reasonable competence.' " (*Id.* at p. 936; accord *People v. Pope* (1979) 23 Cal.3d 412, 426; *Mendoza Tello,* at pp. 266–267.)

Here we are presented with such an exceptional case. It is clear from defense counsel's own statements in conjunction with his mistrial and new trial motions that there was no tactical basis for his failure to provide the second jury with evidence establishing that Zaheer was driving his own car on the night in question. It was merely an oversight, understandable perhaps given that the case was tried twice by the same attorneys on both sides. As defense counsel explained, he mistakenly thought the prosecution stipulated or conceded that Zaheer was driving his Honda in the first trial. But while the prosecutor did make casual references to that effect, there was no express agreement or stipulation. And when Zaheer declined to testify, counsel neglected to shore up a gap that would be left in the evidence without his client's testimony. After the prosecutor exploited the gap in closing argument, defense counsel conceded that this failure of proof constituted "ineffective assistance on my part." This provides us with rare insight into counsel's own evaluation of his conduct. Apart from defense counsel's own concession, the architecture of the defense case demonstrates that a reasonable lawyer would not have overlooked the issue. A weakness in Martha's account was her assertion that Zaheer locked her door from his side of the car. Defense counsel examined three witnesses about the broken electronic locks—a point that would be entirely irrelevant if Zaheer and Martha were in a different car. Even without calling additional witnesses in the second trial, the defense attorney could simply have asked Martha which car they were in. Indeed, counsel had nothing to lose in posing this question;

13

in the event her story changed, he could impeach Martha with her prior statements to police describing the vehicle as a Honda. We can conceive of no tactical reason for the omission of this evidence, and the significant hole it left in the defense case demonstrates counsel's objectively deficient performance.

Ordinarily, we would proceed from this point to evaluate prejudice— whether absent counsel's deficient performance it is reasonably likely that Zaheer would have obtained a more favorable outcome. (*Strickland, supra,* 466 U.S. at p. 694; *Ledesma, supra,* 43 Cal.3d at pp. 217–218.) In this case, however, defense counsel's deficiency created an opening for the prosecutor, who seized on it in her closing argument. Before we continue, we must therefore consider the prosecutor's actions.

2.     *Prosecutorial Error*

Zaheer highlights several statements made by the prosecutor in her closing argument, characterizing them as violations of due process, degradations of the People's burden of proof, and contributors to his cumulative error claim. But we are most troubled by the prosecutor's suggestion *in the wake of defense counsel's error* that Zaheer might have been

14

driving a company car on the night of the incident.[9]  Defense counsel's failure, standing alone, may not have prejudiced Zaheer's second trial had the prosecutor's argument assumed—as everyone did in the first trial—that Zaheer was driving the Honda.  But after the prosecutor seized on the evidentiary gap that defense counsel left in his case, the interplay between that omission and the prosecutor's factually false suggestion threatens the integrity of the result.

Zaheer frames his claim as one of prosecutorial error under *In re Sakarias* (2005) 35 Cal.4th 140 (*Sakarias*), a case that involved a prosecutor arguing mutually inconsistent and irreconcilable factual theories in separate proceedings against codefendants.  Although we find *Sakarias* easily distinguishable, the fact that the prosecutor's suggestion to the jury rested on an inference she had every reason to doubt is nonetheless disturbing.  We acknowledge that prosecutors maintain wide latitude to argue facts and draw inferences from the evidence at trial to zealously support their case.  But their ultimate responsibility is to seek a just outcome, not merely a win. (*People v. Purvis* (1963) 60 Cal.2d 323, 343; *People v. Vance* (2010) 188 Cal.App.4th 1182, 1199; *Berger v. U.S.* (1935) 295 U.S. 78, 88.)  Prosecutorial

_____

[9]     The People argue that Zaheer has forfeited this claim of error by failing to object during closing argument.  (See *Centeno, supra*, 60 Cal.4th at p. 674.) But forfeiture is excused when an objection would have been futile.  (*Ibid*.) Here, an objection followed by an admonition would have done little to "unring the bell" once the prosecutor had suggested use of a different car. (See, e.g., *People v. Johnson* (1981) 121 Cal.App.3d 94, 104.)  Moreover, just shortly before the prosecutor made her suggestion, defense counsel objected twice to the prosecutor's statements that "juries find defendants guilty beyond a reasonable doubt every day."  The judge overruled both objections, and after the second one the prosecutor insinuated the defense's objections were meritless attempts to interrupt her.  On this record, we find no forfeiture and consider the claim on its merits.  (See *People v. Sanborn* (2005) 133 Cal.App.4th 1462, 1466.)

error occurs under state law when the district attorney uses "deceptive" or "reprehensible methods" to sway a jury or judge, resulting in a reasonable probability that the defendant would have received a more favorable outcome absent this conduct. (*People v. Martinez* (2010) 47 Cal.4th 911, 955; accord *People v. Price* (1991) 1 Cal.4th 324, 447.)

So where exactly does the prosecutor's suggestion in this case fall on a continuum between zealous advocacy and error? At the very least it was misleading. She knew or had strong reason to believe that Zaheer was driving his own Honda the night of the incident. Two police reports in her possession supported this conclusion. But she nonetheless suggested Zaheer might have been driving a company car. Although she couched it as a mere possibility, the inference she sought to draw was hardly subtle: "What we don't know is whether or not that was even the car that the defendant was driving. [¶] He works for an auto parts place. He delivers auto parts. He has a company car. There was no testimony that said, yes, that car is the same car that he picked up Martha in. Maybe it was, maybe it wasn't."

Attempting to defend her comments, the prosecutor insisted her statement was accurate: "I did not argue that the Honda was not the car that the defendant drove, I argued that there was *no evidence* that it was the same car." (Italics added.) This purported distinction fails to persuade. The lack of evidence as to whether Zaheer was driving the Honda was relevant only to the extent that it suggested he might have been in a different car with working electronic locks. By representing to the jury that this was a real possibility, the prosecutor swept aside a significant problem in Martha's testimony, bolstering her credibility in a case that wholly turned on it. The prosecutor's careful phrasing did not undermine her suggested inference.

16

The Ninth Circuit Court of Appeals confronted similar prosecutorial remarks in *United States v. Reyes* (9th Cir. 2009) 577 F.3d 1069 (*Reyes*). Defendant Reyes was prosecuted for falsifying corporate records in a scheme involving backdated stock options. (*Id*. at p. 1072.) His primary defense was that he did not know about the backdating and was merely following the finance department's lead. Despite the prosecutor's awareness from related FBI and SEC investigations that some senior members of the department did know about the routine falsification of records, he nonetheless argued to the jury that *no one* in the finance department knew, relying on testimony to that effect from a lower-level employee. (*Id*. at pp. 1074, 1077.) Although the prosecutor's argument was supported by the limited evidence at trial, he had personal knowledge of other facts indicating it was untrue. Finding prosecutorial error, the *Reyes* court explained that "it is improper for the government to present to the jury statements or inferences it knows to be false or has very strong reason to doubt." (*Id*. at p. 1077.) The error was "particularly prejudicial" because the false statement went to the heart of Reyes's defense that he had delegated his responsibilities and relied on others to perform. (*Id*. at p. 1078.)

The *Reyes* prosecutor went a step further than the prosecutor in this case by explicitly stating that no one in the finance department knew about the backdating. By contrast, the prosecutor here equivocated, suggesting only that Zaheer *might* have been driving a company car. Despite facial differences in degree, the prosecutors in both cases invited jurors to draw a false inference that cut to the heart of the defense case. In either instance the effect would be the same—to induce the jury to rely on a false material fact.

Concerning as the prosecutor's suggestion here was, we need not definitively determine if it would independently amount to prosecutorial error. It is, rather, the *combined effect* of defense counsel's failure to establish a critical predicate fact and the prosecutor's decision to take advantage of his omission that we consider. Evaluating these issues together, it is clear that the prosecutor's argument, whether erroneous or not, was made possible by and flows directly from defense counsel's earlier mistake. But for that oversight, the prosecutor would have been unable to advance her misleading suggestion. Against that backdrop, we proceed to evaluate the full consequences of defense counsel's omission.

3. *Prejudice*

Not infrequently, reviewing courts find missteps by both defense counsel and prosecutors to be harmless. (See *People v. Rowland* (1992) 4 Cal.4th 238, 277; *People v. Lambert* (1975) 52 Cal.App.3d 905, 911; *People v. Winn* (2020) 44 Cal.App.5th 859, 867.) Here, however, the combined effect of the defense counsel's failure to establish a necessary predicate fact and the prosecutor's exploitation of that omission collectively deflected a substantial reason to doubt Martha's story. We consider this chain of events because prejudice is a *contextual inquiry* that examines the actual effect of a defense attorney's error on the trial outcome. (See, e.g., *In re Jones* (1996) 13 Cal.4th 552, 586 [prosecutor's exploitation in closing argument of an evidentiary gap left by defense counsel demonstrated why "defense counsel's deficient performance as to this issue clearly was significant"]; see also *Strickland, supra,* 466 U.S. at p. 691 [the focus of the prejudice analysis is whether the error affected the judgment].)

Given the strong indications this was a close case that turned entirely on Martha's credibility, we are compelled to conclude there is at least a

18

reasonable probability of a different result in the absence of defense counsel's omission. (See *Ledesma, supra,* 43 Cal.3d at pp. 217–218.) A reasonable probability does not mean "more likely than not," but merely "a probability sufficient to undermine confidence in the outcome." (*Strickland, supra*, 466 U.S. at pp. 693–694.)

The Supreme Court has recognized that a hung jury in an earlier trial may be a relevant consideration in evaluating prejudice. (See *In re Richards* (2016) 63 Cal.4th 291, 320 (conc. opn. of Liu, J.) and the authorities collected there.) We believe the jury splits on the lesser included offenses in the first trial are indicators of prejudice here because they show that five of the original jurors did not find Martha's testimony sufficiently believable in any respect to establish proof beyond a reasonable doubt. These five jurors would have voted to acquit Zaheer on both felony counts and the lesser included misdemeanors. The jury was instructed that the key difference between felony and misdemeanor sexual battery is the element of unlawful restraint, which is only required for the more serious conviction.[10] (Compare CALCRIM No. 935 with CALCRIM No. 938.) If it found Martha generally credible but remained uncertain that the People had proved the unlawful restraint element of the felony charges, we would expect to see a close to

---

[10]    Though not relevant here, the misdemeanor crime also differs from the felony by permitting the intimate touching to occur over clothing rather than skin-to-skin contact. (Compare CALCRIM No. 935 with CALCRIM No. 938.)

unanimous vote on the misdemeanors.[11] That the opposite occurred, with nearly half the jury indicating its general disbelief of Martha's testimony, is so striking that it was noted by Judge Rogers after the mistrial was declared.

Apart from the jury tallies in the first trial, there are other indications that the second trial presented a close case. The second jury asked for a readback of Martha's testimony—specifically her description of the intimate touching of her breast and Zaheer's penis. It also asked to hear testimony regarding her attempt to report the incident in Rancho Peñasquitos and Officer Dewitt's testimony—i.e., that a person seeking to file a report would not be turned away. Generally, jury requests to hear testimony again indicate that "deliberations were close." (*People v. Pearch* (1991) 229 Cal.App.3d 1282, 1295.) These particular requests suggest, at a minimum, that Martha's credibility was a point of discussion and not easily resolved.

This is undoubtedly an unusual case. An alleged sexual assault victim has twice come forward to share her story, and we do not find prejudice lightly. We fully appreciate that no two trials are alike, and here there were differences apart from defense counsel's mistaken assumption and the prosecutor's exploitation of that mistake in the second trial. Yet the fundamental story in both trials was the same, and the key issue in both trials—acknowledged by everyone—was whether Martha should be

---

[11] To find Zaheer guilty of the misdemeanors, the jury would have had to find that (1) Zaheer touched an intimate part of Martha's body (her breast) and/or made her touch an intimate part of his (his penis), (2) the touching was done against her will, and (3) the touching was done for sexual arousal, gratification or abuse. (CALCRIM No. 938.) If Martha was considered generally credible by the jury, these elements were easily established by her testimony.

20

believed.[12] Defense counsel failed to establish a predicate fact critical to showing she wasn't credible. And the prosecutor then seized on this failure, inviting a false inference to suggest she was.

Ultimately, the votes in the first trial and readbacks in the second compel us to find prejudice. Given the number of jurors who seemingly disbelieved Martha in the first trial, coupled with indicators that her credibility was also debated by the second jury, there is a reasonable chance that at least one juror relied on the prospect of a different car to reconcile his or her doubts about the reliability of Martha's testimony. And while the door lock discrepancy was not the *only* evidence casting doubt on Martha's credibility, we need not be certain it was the dispositive issue; we need only find there is a reasonable possibility that it swayed at least one juror. (See *People v. Walker* (2015) 237 Cal.App.4th 111, 118 [evaluating likely impact of instructional error on "at least one juror"]; *People v. Soojian* (2010) 190 Cal.App.4th 491, 521 ["a hung jury is a more favorable result than a guilty verdict"].) The record compels this conclusion.

---

12    Despite many differences in evidentiary rulings between the first and second trials, none of the evidence excluded at the second trial bore directly on Martha's account of what happened. The door lock evidence was unique in this regard, serving as a bellwether for Martha's credibility and not merely establishing whether she was physically restrained.

## DISPOSITION

The judgment is reversed and the matter is remanded to the trial court for further proceedings.

DATO, J.

I CONCUR:

IRION, J.

BENKE, Acting P. J., dissenting.

I cannot agree with the majority opinion. I focus my concerns at two levels, the analytical framework of the opinion and the substantive issues. I address them separately.

I

THE ANALYTICAL FRAMEWORK OF THE OPINION

A. *The majority uses,* carte blanche*, the evidence and record from the first trial to decide the current case. This violates settled law prohibiting us from doing so.*

I find concerning the majority's reliance on the evidence, arguments, and jury's voting from defendant's *first* trial to decide issues arising from defendant's *second* trial, which is the subject of this appeal. In so doing, the majority—without legal authority—contravene well-settled law that the effect of a mistrial declaration is the same as " ' "if there had been no trial on that issue." ' " (*People v. Sons* (2008) 164 Cal.App.4th 90, 99 (*Sons*).)

The majority relies upon *In re Richards* (2016) 63 Cal.4th 291, 320 (*Richards*) (con. opn. of Liu, J.) to support its position. I note their reliance on *Richards* extends only to the position that "[t]he Supreme Court has recognized that a hung jury in an earlier trial may be a relevant consideration in evaluating prejudice." (Maj. opn., p. 19.) However, nowhere does the majority or concurring opinion in *Richards* give us permission to comb the record of a prior trial and use it as broadly as the majority does here, or as appellate counsel has done in his opening brief.

Examining *Richards* closely, there were two trials involved (*Richards I and Richards II*). In *Richards II,* the prosecution's dental expert recanted his testimony from nearly a decade earlier in *Richards I,* that a human bite mark on defendant's wife's hand matched defendant's unusual teeth. The issue

there involved former Penal Code section 1473, subdivision (b) and a claim of "false evidence" in connection with a writ of habeas corpus. The question before the court was whether an expert's recantation of his testimony constituted "false evidence" within the meaning of section 1473, subdivision (b). We do not have such a specific, limited imperative in this case.

The majority expands *Richards* far beyond its holding, and in doing so, creates clear conflict with settled law forbidding us to use without limitation, the rulings, evidence, and perceived jury findings, of prior trials that have ended in a hung jury.

The difficulties caused by the majority's broad reliance on the record, evidence and inferences from the first trial to resolve the instant case become readily apparent when considering a potential third trial of defendant. Is the prosecutor in a third trial bound to consider the evidence, arguments, and how the jury voted, not only from defendant's first trial, as the majority has done in this appeal, but also from this second trial, when he was convicted of the charged offenses?

And finally, if the defense, in a possible third trial, decides again, for whatever reason, not to question Martha regarding the identity of the car in which she was attacked, or otherwise moves to admit such car evidence, is the prosecutor nonetheless now *required* to introduce such evidence? Such

concerns surely underlie the settled law that we may not use, *carte blanche*, the record or evidence from prior trials where there has been a hung jury.[1]

B. *The majority has altered step two of* Strickland v. Washington (1984) 466 U.S. 668, 688 (Strickland) *and* People v. Ledesma (1987) 43 Cal.3d 171 (Ledesma), *which require the prejudice caused by defense counsel's incompetence be caused by him, not someone else.*

The majority opinion correctly states the test for determining ineffective assistance of counsel: "To prevail [on such a claim], the appellant must first demonstrate that the defense attorney's performance was deficient—meaning it 'fell below an objective standard of reasonableness . . . under prevailing professional norms'—*and then show prejudice resulted.* (*Strickland*[, *supra*,] 466 U.S. 668, 688 . . . ; accord *Ledesma, supra,* [43 Cal.3d] at pp. 215–217.)." (Maj. opn., p. 12.) (Italics added.) Thus, a finding of incompetency requires a two-step analysis directed first at whether defense counsel's performance was deficient; and second, whether defense counsel's deficient performance caused sufficient prejudice to require reversal.

In applying the test required by established law, however, my colleagues instead find prejudice stemming from perceived impropriety of others and attribute it to defense counsel.

---

[1]    I do not share the majority's conclusion this case was "close," ostensibly because it turned on the credibility of Martha; and, more important, because of how the jury voted in the first trial. (See *Sons*, *supra*, 164 Cal.App.4th at p. 99 [rejecting argument the judge erred in refusing in the defendant's fourth trial to give certain jury instructions that a different judge had given in defendant's second and third trials, which had ended in mistrials, and concluding the "effect of a declaration of a mistrial" was the same as " ' "if there had been no trial on that issue" ' [citation]"].)

My colleagues conclude defense counsel acted incompetently because he left a "void" in the evidence respecting the identity of the car and car locks. They assert defense counsel failed to pursue these matters with Martha and thereby failed impermissibly to establish a "predicate fact." This in turn allowed the prosecutor to "seize" on the void and make inappropriate arguments at a motion for new trial.

The majority addresses their logic as follows: "Ordinarily, we would proceed from this point to evaluate prejudice—whether absent counsel's deficient performance it is reasonably likely that Zaheer would have obtained a more favorable outcome. [Citations.] In this case however, defense counsel's deficiency created an opening for the prosecutor, who seized on it in her closing argument." (Maj. opn., p. 14.)

Later, the majority states: "Not infrequently, reviewing courts find missteps by both defense counsel and prosecutors to be harmless. (See *People v. Rowland* (1992) 4 Cal.4th 238, 277 [(*Rowland*)]; *People v. Lambert* (1975) 52 Cal.App.3d 905, 911 [(*Lambert*)]; *People v. Winn* (2020) 44 Cal.App.5th 859, 867 [(*Winn*)].) Here, however, the combined effect of defense counsel's failure to establish a necessary predicate fact and the prosecutor's exploitation of that omission collectively deflected a substantial reason to doubt Martha's story. We consider this chain of events because prejudice is a *contextual inquiry* that examines the actual effect of a defense attorney's error on the trial outcome. [Citation.]" (Maj. opn., p. 18.)

It bears repeating that what the majority has done is find incompetency by defense counsel for creating a "void" in the evidence and conclude the prejudice exists because the prosecutor took advantage of that

4

void.[2]  In short, the prejudice was due to what someone else did in response to a decision made by defense counsel.  Such a definition of "prejudice" is far too broad.

I do not find U.S. Supreme Court or California authority permitting the majority's expansion and thus alteration of the second step of our well-settled incompetency test.  Neither *Rowland*, *Lambert*, or *Winn*, the only cases cited by my colleagues, support such an interpretation of "prejudice."

While it is certainly helpful to point out there exists prejudice caused by others which adds *simultaneously and separately* to defense counsel's *own* reversible prejudice, I find no support for the concept that the possible prejudice of others may *take the place* of the requirement defense counsel's conduct, or lack thereof, caused the reversable prejudice.  The defense counsel's decision to leave the identity of the car open did not *itself* lead to any prejudice.  The majority should not be permitted to reach out and use someone else's response to defense counsel's tactical decisions in order to establish defense counsel's prejudice.

The effects of the majority's reformulation of where we may look for prejudice to satisfy *Strickland*'s second prong is troubling.  The effects of a finding of incompetence on a defense attorney is no small matter.  Once found incompetent, this court must formally report defense counsel to the state bar, which might trigger an investigation and questions about professional licensing.  Counsel will almost certainly carry the private and public stigma of incompetency.  This in turn, may affect a number of matters, including future assignment of cases, appointment levels for project work throughout

---

[2]  Of course, even before analyzing the prejudice argument raised by my colleagues, one must accept the majority's conclusion defense counsel acted incompetently.  That will be addressed later in this dissent.

5

the state, and perhaps even insurance. It is fundamentally unfair to subject defense counsel to these possible professional and financial sanctions, based not on what he or she did but on what someone else did, or did not do. In this regard, and importantly, the majority strips from defense counsel the right to fully respond to accusations of his or her incompetence, or explain his or her conduct to this court.

Finally, permitting the prejudice element required by *Strickland* to rest on what others besides defense counsel have or have not done creates rather strange results and questionable policy. Here, for example, it was defense counsel who objected to the statements made by the prosecutor, thus making a required record for appeal. This allows the majority now to conclude defense counsel was correct. But why would defense counsel vigorously pursue such errors by others at trial, which, if established on appeal, might contribute to defense counsel's own incompetence? The point is, defense counsel should not be troubled worrying that, by establishing the impropriety of others at trial, he or she might be contributing to a finding of his or her own incompetence on appeal.

II

BASED SOLELY ON THE RECORD EVIDENCE FROM DEFENDANT'S SECOND TRIAL, I WOULD CONCLUDE THAT DEFENSE COUNSEL WAS NOT INEFFECTIVE, AND EVEN IF HE WAS, NO PREJUDICE RESULTED

A. *Because the record reflects possible valid tactical reasons why defense counsel created a "void" and did not require Martha pin down the exact car she was in, we cannot conclude defense counsel was incompetent.*

Preliminarily, I note the majority makes much of defense counsel's "evaluation" of his own conduct on retrial, concluding such self-reflection

6

provides "rare insight" into defendant's ineffectiveness claim. (Maj. opn., p. 13.) I disagree with the majority's reading of the record. The citations presented by my colleagues show counsel was stating no more than *if* he had actually ignored what he considered to be the important question of the car involved, he would have deemed himself incompetent. He was not saying he *did* leave it out and was therefore incompetent. As defense counsel noted, he had actually spent considerable, daily, trial time addressing the car and the car-lock issues. The "concession" comments by defense counsel were a bit of hyperbole. Nothing more. They add little to a determination of the merits of defendant's ineffectiveness claim.

Defense comments aside, in examining claims of incompetency of counsel, we accord great deference to counsel's reasonable tactical decisions. (*People v. Weaver* (2001) 26 Cal.4th 876, 925 (*Weaver*).) " 'Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts.' [Citation.]" (*Id.* at p. 926.) "When examining an ineffective assistance claim, . . . there is a presumption counsel acted within the wide range of reasonable professional assistance." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

" ' "[If] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected.' [Citations.] A claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding. [Citations.]" (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–267 (*Mendoza Tello*).)

The majority claims there is simply no satisfactory explanation why defense counsel did not question Martha about the identity of the car in

7

which she was attacked.  My examination of the record reveals counsel logically had a reasonable tactical reason for proceeding as he did in the second trial.

If, on the one hand, Martha identified that car as a Civic, it would have added little to the defense's case, as the car's identity where the attack occurred did not appear to be a significant issue during the second trial, despite the majority's conclusion otherwise.  Indeed, it appears the defense, and likely the jury as well, assumed the attack occurred in the Civic, given the substantial evidence proffered by the defense to show the automatic locking system in the Civic had not been functioning since defendant bought the car.  Moreover, as shown by the record evidence, Martha was equivocal regarding whether defendant had actually locked her passenger door from inside the car.

If, however, Martha could not identify the car she was riding in, or had testified it was not defendant's Civic, defense counsel during closing would have been left with the *same* argument he actually made to the jury, to wit: that Martha was not credible and, for various selfish reasons, made up the story of the attack.  By not questioning Martha about the identity of the car, after the People failed to make such inquiry on direct, defense counsel was able to rely on the prosecutor's fleeting "red herring" comment and make a very persuasive argument for defendant's innocence.  The defense claimed that the People on direct did not question Martha about the car because they surmised she would be unable to identify it as the Civic, despite her detailed description of the attack.  Thus, unlike the majority, I believe defense counsel's failure to ask Martha on cross-examination about the identity of the car can be justified as a reasonable tactical decision.  (See *Weaver*, *supra*, 26

8

Cal.4th at p. 925 [affording great deference to counsel's reasonable tactical decisions].)[3]

Because the defense attorney had a sound tactical reason to NOT pin down the identity of the car and existence of car locks, we cannot find incompetency.

B. *There is no prejudice resulting from defense counsel's tactical approach.*

As I have noted previously, what someone else did in response to the defense counsel's tactical decision not to pursue the identity of the car, does not constitute prejudice caused by defense counsel. In any event, there was no prejudice emanating from the decision not to pursue the identity of the car. This is so because the restraint of Martha was caused *by defendant* physically controlling Martha. The car locks and identity of the car went to credibility but did not impact the reason Martha was restrained. This conclusion is supported by the record.

*Martha's Testimony*

The record reflects that defendant parked his car and Martha told him she did not want any further contact with him, as he already had overreached at the coffee shop, including touching her breast over her clothes. Martha went to open the car door. She testified on direct that defendant then "grabbed" her, pulled her close to him, and said, "Don't do it." Martha further

---

[3] My colleagues offer what they perceive are better ways to have handled the clicking sound and car-ownership issues, and I am certain they may have done a fine job trying defendant's case. However, trial tactics and decisions are not ours to make, particularly when we, unlike trial counsel, are afforded 20-20 hindsight. It also would have been useful of course to hear what defense counsel might have added if he had been allowed to address the matter at a factual level via a writ of habeas corpus. (See *Mendoza Tello*, *supra*, 15 Cal.4th at pp. 266–267 [noting an ineffective assistance of counsel claim "is more appropriately decided in a habeas corpus proceeding"].)

9

testified that, as defendant "forcefully" held her, he *next* used his other hand in an attempt to lock the car doors from inside:

> Prosecutor (P): "I'm sorry. What were you doing when he locked the doors?
> Martha (M): "He was holding me with his hand pulling me towards him.
> P: "Was he holding you *forcefully*?
> M: "Yes." (Italics added.)

The majority does not address the testimony that defendant was "forcefully" holding Martha against her will and pulling her towards him—away from her car door—*before* he attempted to lock the car doors from inside. Instead of quoting Martha's testimony, the majority describes it thusly, "She reached for the door, which she said was unlocked, but Zaheer grabbed her hand and said, 'Don't do it.' Then he allegedly locked her door from his side of the car; she heard a click, and when she reached for the handle again she now found her door locked." (Maj. opn., p. 4.) There is no mention of force or restraint by defendant in the majority "description" of events as testified to by Martha.

Martha on cross-examination provided additional testimony regarding defendant's use of force before he attempted to lock the car doors from inside:

> Defense counsel (DC): "You saw the door lock was unlocked on your side of the car, correct?
> M: "Right. It did not have the—correct, yes.
> DC: "And you attempted to open the door with your right hand.
> M: "Yes.
> DC: "And [defendant] with his left hand pulled your right hand towards him; is that right?
> M: "Say again?
> DC: "[Defendant] grabbed your right hand before you could reach the door handle; is that right?
> M: "No. With my right hand, I grabbed the door. He, with his right hand pulled my left hand, and I let go of the door because *he pulled me on top of him, and said, Don't do it. And I said, Let me go. That's when*

10

*he did click at his door so that the doors would lock, and when I went over, you could not open it.*" (Italics added.)

Thus, Martha felt "trapped" in the car *before* she heard the "click[ing]" sound (discussed *post*), as defendant pulled her "on top of him."

Moreover, also during cross-examination Martha testified that the clicking noise came from *defendant's* side of the car, not hers; that the clicking noise was *not* the sound of the car doors being locked, but ostensibly the sound of the button being pushed by defendant; and that she in response *thought* her door had been locked, even though she did not hear the car door being locked on her side of the car:

> DC: "So he locked all the doors by doing something on his side of the car; is that what you're telling us?
> M: "I don't know if it was all the doors, but mine was locked.
> DC: "And that was after you heard this clicking sound, correct?
> M: "His click. His click. *Not the doors.* His.
> DC: "The clicking, it was on his side of the car; is that right?
> M: "Yes, on his side.
> DC: "And then the doors locked; is that right?
> M: "When I pulled, it was locked. Because I *thought* since he clicked over there and I *didn't hear it over here*, and the door was locked.
> DC: "And how did you know the door was locked on your side of the car?
> M: "Well, I got so scared that I wasn't going to notice how many doors were locked or anything, but mine was." (Italics added.)

Martha's testimony on redirect is additional support for the finding that she was not completely sure the clicking noise she heard coming from defendant's side of the car actually meant her door had been locked from inside, but that she nonetheless felt restrained by defendant's use of force against her:

> P: "So, when you were in the car and the defendant locked the door, you testified you heard what you thought was a click; is that correct?
> M: "Yes.
> P: "Are you certain that you heard a click?

11

M: "I was so afraid that I *felt* that I heard the click, but I did see when he went click on his door and that click, I did hear." [¶] . . . [¶]
P: "Did you testify on cross-examination just a few minutes ago that you don't know if all the doors were locked, but you know yours was locked?" [¶] . . . [¶]
M: "That's right. I didn't look at the other doors. *He had me grabbed by the hands and pressure*, and the only one [i.e., car door] that I was worried about was mine." [¶] . . . [¶]
P: "When you were in the car, I believe that you testified on cross-examination that, or at least you were asked if he was—if the defendant was touching and grabbing you the *whole time*?" [¶] . . . [¶]
M: "Yes.
P: "Do you *feel restrained the whole time*?
M: "*Completely*." (Italics added.)

*Shakila A.'s testimony*

Called by the defense, defendant's cousin Shakila testified defendant, his wife, and their three children lived in her home for about a month in 2014 after they immigrated from Afghanistan. She further testified that defendant and his family did not own a car; and that in 2015, she sold defendant her Honda Civic.

Shakila was asked about the electronic car-locking system inside the Civic. She testified that system was not working when she sold defendant the car. She added, "When you *clicking*, it doesn't work. You have to do manual. When you get out from the passenger side, you have to push the button down to lock the car before you get out." (Italics added.)

12

*Zaheers wife's testimony*

Also called by the defense, Zaheer's wife (MZ) testified that she and her husband purchased the Civic from Shakila; that at the time of their purchase, the car's electronic locking system was not working; and that since they have owned the car, its electronic locking system has never worked. During cross-examination, she testified at the time of the incident her husband was working for an auto parts store. She also testified defendant was driving the Civic on the day of the incident.

After some additional questioning on redirect, the following colloquy took place on re-cross:

> P: "When he [i.e., defendant] delivers auto parts, does he drive his own car?
> MZ: "No.
> P: "He drives a company car? I'm sorry. Was that a 'yes'?
> MZ: "Yes."

I find the car-locking issue, which is the basis for my colleagues' reversal of the judgment, largely irrelevant in this case because I agree with the prosecutor this issue was "small" and was a "red herring" when considering the substantial evidence supporting the finding that defendant's own conduct, and not the car's door locks, unlawfully restrained Martha.

In conclusion, although the record supports a finding defense counsel was guided by tactical decisions in not asking Martha on cross-examination about the identity of the car in which she was attacked, I also conclude from the above evidence that defendant, in any event, suffered no resulting "prejudice" as that term was defined prior to the majority's opinion in this case.

13

## III

### THE PROSECUTOR DID NOT COMMIT MISCONDUCT; AND ANY ALLEGED MISCONDUCT BY THE PROSECUTOR WAS HARMLESS BEYOND A REASONABLE DOUBT

During closing argument, the prosecutor addressed the issue of whether defendant had locked Martha's car door from inside based on the "clicking" sound Martha heard, after he had stopped the car and forcefully grabbed her. The prosecutor suggested this issue was a "red herring," arguing as follows: "In this case, Martha believed that she heard the door locks. That's what she believed, but put yourself or think about where she was at that point. She's in a car with this guy, he's holding her, she's struggling with him, she's trying to get away, he's touching her and kissing her and telling her that she belongs to him. She believes she heard the door locks.

"According to the witness that testified [for the defense], the door locks didn't work, but what is uncontroverted is that the door was locked. Now, how it got locked, we don't know for sure, but Martha didn't lock it. So, the only person that could have locked the door was the defendant.

"So what really matters in this case is whether or not the victim, in fact, felt restrained *and doors didn't have to be locked at all for her to be* [*sic*] *feel restrained. If he was holding her so she can't get out. What she testified to is he was holding her so she could not get out and she also testified that she had to unlock the door to get out.*

"We heard all about how obvious how the [defense witness] came in from Escondido Auto Parts and said those car door lock [*sic*] attenuated, I think was the word, weren't working.

14

"We know that the defendant's wife and cousin love him, support him, want to help in any way they can, said that the door locks didn't work. What we don't know is whether or not that was even the car that the defendant was driving.

"He works for an auto parts place. He delivers auto parts. *He has a company car. There was no testimony that said, yes, that car is the same car that he picked up Martha in. Maybe it was, maybe it wasn't. We don't know, but I'm going to ask you to not go off on a tangent about the door locks because that is such a small issue here, because what we know is she felt restrained,* she says she thought she heard the door locks. You can take her at her word." (Italics added.)

During his closing, defense counsel took up the issue of the identity of the car defendant was driving on the night of the attack and the prosecutor's comment about the door locks being a "red herring." He in response argued, "I disagree with [the prosecutor]; I think this is pretty significant. I think she thinks it's a red herring because she didn't know what to do with, and I heard her say in closing argument that we don't know whether or not this is [defendant's]—or this was the car that [defendant] was in. Now, think about that for a moment.

"If you're a prosecutor and you know that a significant problem with your case is the fact that this woman, your victim describes in excruciating detail how she listened and saw the car being locked with the electronic locking system, and after she first gives that testimony, the defense later goes out and proves that the locking system doesn't work on that car, on his car. Now, if you have any question about whether or not that's his car, if there is any doubt in your mind, what are you going to do?

15

"You're going to show it to Martha, you're going to say, is this or isn't this his car if there is any doubt at all. And if that wasn't his car, what do you think would happen?

"You would have heard Martha on the stand saying that's not the car I was in. You wouldn't wait until closing argument and try to convince the jury that's a red herring or that's a legitimate reason to explain Martha's testimony and the problems with her testimony."

After additional argument, the defense concluded on this issue: "It's indisputable that that locking system didn't work, and it's clear that Martha is simply not telling the truth about that, and there is a jury instruction that talks about this."

The issue of prosecutorial misconduct during closing argument was raised by defendant in a mistrial and new trial motion. The standard we apply in such instances is abuse of discretion: " ' "A trial court's ruling on a motion for new trial is so completely within that court's discretion that a reviewing court will not disturb the ruling absent a manifest and unmistakable abuse of that discretion." ' " (See *People v. Lightsey* (2012) 54 Cal.4th 668, 729 (*Lightsey*).)

In the instant case, the prosecutor's comment regarding the identity of the car was fleeting, as noted *ante*; was made in the context of pointing out this issue was "small" and a "red herring" because Martha had been forcefully restrained by defendant regardless of the door-lock issue (as also noted *ante*); *and* was not an inaccurate statement of the evidence presented in the second trial, where defendant (ostensibly as a tactical matter) did not testify as to the identity of the car he was driving or that the car doors were unlocked, *and* where defendant's wife admitted her husband drove a company car when working.

16

The circumstances of this case do not come close to a showing of a "manifest and unmistakable abuse" of discretion by the trial court in denying defendant's motions. (See *Lightsey*, *supra*, 54 Cal.4th at p. 729.) Unless, of course, consideration is impermissibly given to the evidence and argument from the *first* trial, as the majority has done in finding prosecutorial misconduct on retrial. (See *Sons*, *supra*, 164 Cal.App.4th at p. 99 [noting the "effect of a declaration of a mistrial" was the same as " ' "if there had been no trial on that issue" ' "].)

In any event, even assuming the prosecutor's closing argument constituted misconduct, I find it harmless beyond a reasonable doubt, even when considered in light of defense counsel's alleged ineffectiveness. (See *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).)

As summarized *ante*, there is more than sufficient evidence in the record from the second trial to support the finding of a reasonable jury that Martha was restrained not because her car door had been locked from inside by defendant, but because *he* was forcibly holding her the "whole time" they were in the car, including *before* she attempted to open her car door, as he pulled her on top of him while sitting in the driver's seat of the car.

In addition, the evidence demonstrates defendant threatened Martha by telling her "Don't do it," or words to that effect, *before* he attempted to lock the car doors from inside, is substantial when viewed in context, and separately supports the finding she was "unlawfully restrained" under section 243.4, subdivision (a).

I also find no prejudice resulted from the prosecutor's comments because as summarized *ante*, defense counsel relied on the prosecutor's "red herring" comment and argued persuasively to the jury that Martha was not credible and that the People had not proved their case against defendant

17

beyond a reasonable doubt.  Clearly, the jury disagreed, which was its right as trier of fact.  But my point is the record shows the defense used this alleged misstep by the People to argue defendant's innocence.

In sum, I believe any alleged error by defense counsel in failing to conclusively establish the identity of the car defendant was driving on the night of the attack; and any alleged misconduct by the prosecutor in "seiz[ing]" on this alleged error in her closing when remarking defendant could have been driving a company car but in the end it did not matter because the identity of the car he was driving was a "small" issue and a "red herring" in the case; is harmless beyond a reasonable doubt in light of the record from the second trial.  (See *Chapman*, *supra*, 386 U.S. at p. 24.)

IV

CONCLUSION

I would conclude the majority errs in its *carte blanche* use of the record and rulings from the first trial.  I also believe the majority impermissibly alters the second step of *Strickland* and *Ledesma* to make defense counsel responsible for what others may have done.

Respecting the specific issue of defense counsel's competency, I conclude the record reflects defense counsel could have made a reasonable tactical decision and thus without more on this record, we may not conclude he acted incompetently.  In any event, prejudice has not been shown due to *defense counsel's* conduct.  Finally, the trial court properly found the prosecutor committed no misconduct, and that even if there was such alleged prosecutorial misconduct, there was no prejudice.

I therefore would affirm the judgment.


BENKE, Acting P. J.